GRACE WILLIAMS v. FRANK N. RUSSELL.[1]

February 7, 1936.

No. 30,671.

*Robb & Rich* and *Swanson, Swanson & Swanson,* for appellant. *Wieland & Sullivan,* for respondent.

JULIUS J. OLSON, JUSTICE.

Defendant appeals from a judgment entered pursuant to verdict for plaintiff. There was no motion for new trial. Prior to submission of issues to the jury defendant had moved for an instructed

[1]Reported in 265 N. W. 270.

verdict, which was denied. After the verdict was rendered he moved for judgment notwithstanding. That motion was denied, whereupon judgment was entered. This then leaves for consideration here the sole question of whether the evidence reasonably sustains the conclusions reached by the triers of fact. Taylor v. Northern States Power Co. 196 Minn. 22, 264 N. W. 139.

As is usual and customary in cases of this type, defendant asserts: (1) That the evidence does not sustain a finding of negligence on his part proximately causing the accident; and (2) that even if in error in this regard the evidence, as a matter of law, shows contributory negligence on plaintiff's part precluding recovery.

The usual conflict as to who is at fault and the cases supposed to sustain the issues contended for in such cases have been cited by counsel in their respective briefs and have been thoroughly discussed upon oral argument. Viewing the case, as we must, in the light most favorable to the prevailing party, the record justifies the finding of the following facts: Both parties are residents of Brainerd and have been such for many years. They were well acquainted with the two highways which come to a junction at or near the westerly limits of the city. The two highways are known as trunk highway No. 210 and the "old highway," now designated as the "thru city" highway. The latter at this junction runs in an easterly and westerly direction; No. 210 swings in a gentle and gradual curve slightly to the northeast, that is, to one approaching from the west and going toward Brainerd. The two converge into a common highway to the west in the form of a V-shaped angle, the apex being to the west. At or about the point where the accident took place the surface of both highways is approximately 80 feet in width and covered with a tarvia mat upon a gravel-surfaced and gently rounded grade. There is a downward slope of ground in both directions from the junction which has its highest point or crest at the junction. The surface of the highway was dry. There were no distracting circumstances and no other traffic, vehicular or otherwise, at the time of accident, which took place about 9:30 o'clock the evening of July 18, 1934. The day had been hot and

sultry. The evening was calm and warm. It was quite dark, but, aside therefrom, atmospheric conditions were ideal.

Defendant had gone to a nearby lake to take a swim, the purpose of the trip being to cool off because of the hot weather. He was on his way home to Brainerd. Plaintiff and her friend, Miss Fenke, had been at a social and were driving slowly, 15 to 20 miles per hour, going westerly upon highway No. 210, plaintiff driving her 1929 four-door Hupmobile sedan. She testified:

"As I approached the junction, having in mind to turn, I saw a light to the west but it was so far away it did not bother me as seeing nothing would reach me if I made the turn. I looked to the rear to see if there was anything coming. Feeling I had clear sailing, I gradually drove my car across, my line of vision following where I was drive [driving].

Q. "As you made the turn, which direction did you turn the car towards?

A. "Towards the south. * * * Perhaps, oh, just as I had thought of turning I looked down and saw the headlights, but they looked so far away I had no feeling they would reach me in making the turn. As I looked back to the east if anyone was coming from the rear, and that was clear going, and thinking this car could not reach me, I made this turn to go and to the east and followed my line of travel with my vision where I was driving."

And further:

Q. "Just immediately before the accident as your line of vision turned, did you see any car after or during that time?

A. "As I was turning?

Q. "Yes.

A. "No, I did not.

Q. "What was the first you knew after you started making the turn that anything was out of the way?

A. "I heard the squeak of brakes.

Q. "Yes, and then what?

A. "Then I felt like I was just going way down a tunnel, a lot of tin and glass and so forth was coming after me."

On cross-examination she testified that when she started to make the turn the lights coming toward her from the west appeared to be about two and one-half blocks distant from her. She admitted that she was not a good judge of distances when measured in feet. Be that as it may, the fact remains that she was an experienced driver and was accustomed to both day and night driving because of her professional endeavors, she being a doctor. Miss Fenke testified that as the turn was about to be made the car approaching from the west appeared to be at least two blocks away. She said: "Judging what car lights look like at a distance, they must have been at least two blocks" (away). Plaintiff testified that she had turned her car and was proceeding across the intersection so that her lights were directed southerly or southeasterly at or immediately prior to the impact.

Defendant's testimony is to the effect that he was driving at a rate of 40 to 45 miles per hour. There is no other direct testimony as to the speed at which he was traveling. But, as we shall see, there is much in the way of physical facts and circumstantial evidence to indicate that a trier of fact would be justified in finding him to have been traveling much faster. He also testified that as he approached and reached the intersection of the two roads he first noticed defendant's car when about 50 feet away from it. He had observed no other traffic. In rounding the gradual curve immediately to the west of the accident his speed was about the same.

Several photographs of the highway, and particularly this intersection, were taken the next morning. Defendant's exhibit 2 is a photograph of plaintiff's car. That exhibit is particularly impressive. The testimony is that plaintiff carried her spare tire immediately behind her right front fender. The photograph shows that the raised lettering on the tire, because of the collision, was so firmly pressed against the body of the car as to stamp upon the enameled body thereof the lettering of the tire. The photograph also shows the imprint of the headlight where the rear and front doors join. Fine particles of glass at that point were ground into the paint of the body. The entire frame and body were bent from six to

eight inches. The motor legs were broken, and so was the flywheel housing. A garage mechanic testified that the car was nothing but junk and was practically worthless except as parts might be sold for repairs. He estimated the remnants to be worth not to exceed $25.

Measurements were taken the next morning by men not at all interested in behalf of either party. These showed that defendant's car had skidded something like 45 feet before the impact. At that time one of defendant's front wheels was broken so that the car dropped down on its axle on the right front side. Deep gouges were made in the tarred surface a distance of from 15 to 21 feet caused by the broken front wheel. Defendant was driving a new eight-cylinder Oldsmobile car. He had driven it only 4,000 or 5,000 miles. It was equipped with four-wheel hydraulic brakes. It was in excellent condition. He had tried it out for speed and had found that it would make 75 miles per hour. Of course this was not the rate he was traveling at the time of accident, according to his testimony. But the physical facts are such as strongly to indicate what has heretofore been suggested, namely, that defendant was traveling at a very high rate of speed.

When the two cars came to rest, plaintiff's was lying on its left side headed in a southerly direction. Plaintiff had been thrown through the top and had landed upon the road some five or six feet immediately to the east of the car. Miss Fenke was not thrown out. She did not go through its top.

On defendant's car the radiator and hood were smashed. The right front wheel was broken. The rim of his steering wheel was bent down. All in all, the evidence clearly establishes that the impact of the two cars must have been a terrific one.

From what has been related it seems too clear for argument that fact questions were presented both in respect of defendant's negligence and plaintiff's contributory negligence. The triers of fact were not strangers to the automobile or the manner in which it should be handled. No longer can it be said that jurymen and women are inexperienced or inexpert in respect of the handling of an automobile. The ownership and driving of such vehicle are now

so common that one may safely say that practically all jurors are experienced in respect of their operation. The verdict has the approval of an experienced and able trial judge.

The time has come when a stop should be put to the reckless driving so prevalent in both state and nation. The death toll from careless driving is surprisingly and unreasonably high. For us to say that as a matter of law negligence is not shown on defendant's part or that contributory negligence is established as to plaintiff would be doing violence to the record before us.

Another point made by defendant is that plaintiff did not hold out her hand indicating that she intended to turn. In view of the fact that defendant did not see plaintiff's car until it was within 50 feet of him and that he then immediately applied his brakes so as to lock the wheels of his car, it is obvious that holding out her hand could not possibly have been of aid to him. Being, as he said, unable to see her car until he was at such close range, it is difficult, in fact to us impossible, to see that he could have observed her arm if it had been extended out of the window. Plaintiff's lights were good. There is no claim to the contrary. The record is such as to disclose, if defendant had been at all watchful of his movements, that there would have been no accident. When plaintiff started to make the turn to her left defendant was obviously a very considerable distance to the west. The gradual turning of her lights toward the south would be across the highway upon which defendant was proceeding. Not having even seen the lights when at a reasonable distance away, it is obvious that he could not have seen her extended arm through the window. Hence there can be no causal connection between her alleged negligent act and the ensuing accident. We have no hesitancy in saying that fact questions alone are involved and that these have been determined by the triers of fact upon adequate evidence.

This case may be disposed of in the language used in the recent case of Overly v. Troy Launderers & Cleaners, Inc. 196 Minn. 413, 265 N. W. 268:

"The driver who is too determined to assert his supposed right of way at intersections * * * has been one of the worst of road

pests. It is to be hoped that common courtesy, with some aid from the law, is causing his dangerous tribe to decrease."

Judgment affirmed.